**FIREMEN'S RELIEF AND RETIREMENT FUND TRUSTEES OF HOUSTON,**
Texas, Appellants,

v.

**Horace FONTENOT, Appellee.**

**No. 11702.**

Court of Civil Appeals of Texas.

Austin.

Oct. 15, 1969.

Rehearing Denied Oct. 29, 1969.

Wm. A. Olson, City Atty., Homer T. Bouldin, Trial Supervisor, Houston, for appellants.

Paul P. Regnier, Houston, for appellee.

HUGHES, Justice.

The Firemen's Relief and Retirement Fund Trustees of Houston, Texas, and the Firemen's Pension Commissioner of Texas denied the application of Horace Fontenot, appellee, for a pension for total permanent disability and he filed suit in the trial court for relief under the provisions of Art. 6243e, Sec. 18, Vernon's Ann.Tex.Civ.St. From a judgment granting appellee the relief prayed for, following a non-jury trial, the Trustees appealed to this Court.

Appellants' first four points of error are jointly briefed. They are that (a) the error of the trial court in holding that the decision of the Fire Pension Commissioner denying a pension was not reasonably supported by substantial evidence, (b) a similar point with reference to the decision of the Houston Board of Trustees, (c) the error of the trial court in holding that substantial evidence had not been introduced on the trial sufficient to sustain the decisions of the Houston Board of Trustees and the Pension Commissioner, and (d) the error of the trial court in not rendering judgment for appellants.

Appellee began working for the Houston Fire Department in June 1953, as a pipe and ladder man whose principal job is to put out fire. He worked in this capacity without difficulty and apparently without physical disability until the Norman Construction and Building Company fire in January

1965. We quote from his testimony regarding this fire:

"A We made that fire and it was quite —I don't remember whether it was a three or four-alarm fire.

Q What was burning there, please, sir?

A Lumber and different types of materials.

Q What were some of those materials?

A Paint and paint thinner and all types of material that a lumber yard would use for building.

Q What happened to you while you were at the scene of the fire?

A After about probably an hour or maybe an hour and a half after we were there, we was told to take the line inside where the paint was stored. We couldn't go inside because of the fumes and the thinner was exploding and some of the paint was too. They had a large steel canopy, porch-like thing, that was overhanging over the door. There was two men, myself and a fellow named Fairchild, was in the doorway using the two and a half inch hose. When the canopy fell down, it came down on top of us and it hit me on the head. I had my helmet on and it stunned me and knocked me inside and it fell on Mr. Fairchild's legs above his knees.

Q Were you knocked unconscious at that time?

A I was stunned. I guess knocked unconscious but not for long.

Q State whether or not there was smoke, fumes, gasses, or anything like that in the immediate room you were in at this particular time, Mr. Fontenot.

A Yes, very much so. There was all of that. Smoke, fumes, and gasses.

Q Did you have your mask on at that time?

A No, sir."

Although it was suggested by some of the firemen that appellee go to the hospital the night of the fire he did not go until the next day. He was examined and treated at the hospital and was then sent to Dr. H. Irving Schweppe, Jr., M.D., a heart and lung specialist who, on July 20, 1966, made a written report concerning appellee from which we quote:

"Mr. Fontenot has chronic bronchitis related to allergic, irritant and recurrent infectious factors. He continues to cough, raise sputum, wheeze and experience breathlessness. By history smoke inhaled in his work in fire suppression distinctly causes difficulty. He has stopped smoking now for some 10 months on our recommendation and continues to have respiratory symptoms.

Mr. Fontenot was studied rather extensively in the last several weeks in the Pulmonary Function Laboratory of Baylor University College of Medicine. These studies confirm the bronchial condition and to date show no evidence of any significant reduction in lung tissue function. It is impossible to predict if this situation will remain stable or changes will develop in the over-all function of his lungs.

It has been our recommendation that Mr. Fontenot be removed from fire suppression entirely He has clear cut evidence of bronchitis and by history, smoke distinctly makes this worse. No statement can be made at this time in terms of long term disability. It is obvious that at present he is unable to fight fire because of the problems with smoke. It is obvious that he could also still do many other things that do not require either smoke exposure or excessive physical exercise without difficulty."

Appellee went to Dr. Schweppe regularly for about a year and a half but continued

to suffer from coughing sputum with blood, dizziness, weakness and shortness of breath and he went to Dr. David Jackson, M.D., F.A.C.P., a heart and lung specialist, who filed a report December 5, 1966, from which we quote:

"As you are aware, Mr. Fontenot was injured while fighting a fire in 1964. At that time he was struck on the head and shoulder by falling objects, and when he was examined for his injuries at Ben Taub General Hospital, certain pulmonary difficulties were found. He was referred to the Medical Chest Clinic, where he was told he had chronic bronchitis and advised to stop smoking. This did not help him, and subsequent examinations and tests in July, 1966 revealed the presence of chronic bronchitis and mild pulmonary emphysema.

Mr. Fontenot now complains of cough, wheezing and sputum with occasional blood-streaking. He is short of breath with exertion and gets heaviness in his midchest with exertion. He also complains of catching cold easily and weakness with exertion.

Physical examination revealed a well-developed, well-nourished individual who had a mild cough. Physical examination of the chest revealed a few rhonchi at the left base.

Chest X-ray was free of active pulmonary infiltration, but showed increase in vascular markings.

I reviewed the pulmonary function tests done in June and July, 1966. In summary, they show airway obstruction and tissue damage compatible with chronic bronchitis and mild pulmonary emphysema.

I have discussed these findings with Mr. Fontenot and have advised him never to be exposed to fumes and smoke again. In my opinion, he would do well to leave the polluted air of this community and find himself a job elsewhere, where the air is dry, clear and free of irritating substances. In my opinion, if Mr. Fontenot does not adhere to this advice, his chronic bronchitis and emphysema will certainly progress, with all the dangers of pulmonary insufficiency."

Dr. Jackson was a witness at the trial and we quote from his testimony:

"Q   And is it your medical opinion that the condition that you have testified about today, namely, chronic bronchitis, that this has originated from your patient, Mr. Fontenot, breathing the fumes, and smoke, and fire, and everything from his job as a fireman?

A   That is correct.

Q   All right, sir. Do you have an opinion as to Mr. Fontenot's condition by his remaining right here in the City of Houston, Doctor, taking into consideration for your opinion, the smoke, if any, pollution, if any, and the humidity, such as it is?

A   Well, yes, I do. I told Mr. Fontenot that he would do better to be in a community where there was no fog and pollution and smoke, and that I thought this was not the very best place for him to be. He showed changes on testing, indicating that he had some lung damage, and I thought if he wanted to be healthy, and live a usual period of time for a man of his age, he ought to be somewhere else where the air was clear and dry, warm.

*       *       *       *       *       *

Q   You have testified already, Doctor, that you have advised his man from his background, and from his condition of chronic bronchitis, not to breath smoke, or the fumes from smoke, or have anything to do with fighting fires any more, I believe this is in your testimony?

A   Correct.

Q All right, sir. Now, based on that, is it your medical opinion that as a result of the chronic bronchitis, which I believe you have testified that Mr. Fontenot has, that this condition is now keeping him from performing the same duties that you have asked him not to perform?

A Yes.

Q All right. Is it your medical opinion, from seeing this man as a patient, that you feel that this disability of performing his duties as a fireman has occurred because of his duties as a fireman of breathing smoke?

A Yes.

\* \* \* \* \* \*

Q May a person like Mr. Horace Fontenot, who by your testimony is disabled from doing his regular work as a fireman, may he remain in Houston with the smoke being what it is, and the pollution being what it is, and enjoy a long, happy life like a person who does not have chronic bronchitis, Doctor?

A No, I don't think so. I think the chances for recurrence, and worsening of his bronchitis is very high in this community.

Q Have you recommended, and do you still recommend that Horace Fontenot leave Houston, Texas, for his health?

A Yes. That was what I told him.

\* \* \* \* \* \*

Q All right. Then, what I am asking is this, Doctor. Is Mr. Horace Fontenot, with his chronic bronchitis, as you have testified his condition to be, if he stays here in Houston, Texas, is his chronic bronchitis going to get any better?

A No. No, I think it might get worse.

Q All right. If, by his very staying in Houston, Texas, whether he is a fireman, or a barber, or anything else, with this chronic bronchitis, is he going to get worse?

A There is a good possibility that he will get worse.

Q All right. Would he get worse to a degree where he could die from this chronic bronchitis condition?

A People can die of this chronic bronchitis. I can't say for him specifically.

Q So, is it your opinion, is it medically sound, then, that Horace Fontenot is totally disabled now, and will be in the future for any activities of a fireman while he is here in Houston, Texas?

A Yes."

On October 26, 1966, Dr. J. Norris Tucker, M.D. filed a report relating to his physical examination of appellee from which we quote:

"The history is very interesting. While fighting a fire about two years ago a canopy fell on him. He was xrayed at Ben Taub Hospital and no evidence of back injury was found, but xrays revealed a lung condition. Since these findings he has been having lung trouble, referred to the Lung Clinic and treated for infected bronchitis and emphysema. Following the reported back injury he continued to work as a fireman until July 29, 1966. Since that time he has been working as a barber.

At the present time he states that the slightest exertion produces shortness of breath, coughing produces sputum and at times wheezing. He has trouble breathing when he gets around smoke of any nature and he gave up smoking about a year ago. During the past two years he has been seen frequently in the Lung Clinic at Ben Taub Hospital and treated by Dr. H. I. Schweppe.

Physically this man is in excellent physical condition. EENT negative. Breath sounds are normal throughout both lung fields with slight increase in bronchial breath sounds. B/P 140/78, rate is regular and normal with no enlargement or murmurs. Abdominal palpation is negative. Back normal with scar of pilondial cyst surgery. Extremities are normal. Xray of the lungs: 'Essentially negative chest.'

Of interest in his report from Baylor Medical School Pulmonary Function Laboratory is their confirmed studies of bronchial condition but shows no evidence of any significant reduction in lung tissue function. Just how long this condition will remain stable is a question.

Any slight amount of physical exertion in my office does produce increased respiratory rate with increase in breathing with some wheezing. I feel his bronchitis must be considered to be related to allergic, irritant or to recurrent infectious factors. It is my feeling that this man is not able to assume the position of a fire fighter, but I see no reason why he could not be retained in some other position not requiring any association with smoke.

Only time will tell as to the extent of the progressiveness of this chronic lung condition."

Appellee's condition at the time of trial was not improved. He suffered, as above stated, and was unable to do chores about his home such as washing the car and mowing the grass without labored breathing.

Appellee last worked for the fire department on June 13, 1966. He had three days off and then took sick leave commencing June 17, 1966, and received sick pay. For about six months prior to leaving the Houston Fire Department, appellee worked in "special service" which was maintenance work not connected with actual fire fighting. He was transferred from this special service on June 13, 1966, back to a fire sta-

tion for fire suppression work. He stayed on this job only one day and attended no fires.

Appellee, after his injury, had also worked in the fire department as house man whose duty was to pump gas into all the station cars. On this job he breathed gasoline fumes. Appellee's pay remained the same after his injury, not being reduced by reason of the work performed.

The record shows that appellee worked as a barber for one year after leaving the Houston Fire Department; he also worked as a salesman for Montgomery-Ward for about six months; at the time of trial he worked as an instructor in a barber college from 7:30 a.m. to 6:00 p.m. These jobs were in the City of Houston.

Appellee was offered work in the index section of the Fire Department which was checking street addresses. Although appellee worked at this job for one week he quit and refused further such employment saying he needed more exercise and did not wish to be "pinned down;" also, there would be more fumes riding up and down the streets. Appellee was offered a similar job November 21, 1966.

When appellee was sent back to the fire station for duty he stated that he could not do fire suppression work and requested work as a maintenance man and would have accepted it had it been offered even though this would have required that he live in Houston. As to remaining in Houston, appellee testified:

"Q  Is it further your considered opinion and judgment from your own personal consideration and experience, Mr. Fontenot, that you cannot remain in Houston, Texas, on account of the reasons of your health?

A  I am not going to remain in the City of Houston.

Q  It's not a question of whether you are going to remain, but do you feel that it is essential and mandatory

in order to save your life that you must remove yourself from the polluted air and the fumes and the gasses, et cetera, in Houston, Texas?

A   Yes, sir, I should move and I will."

■   If the decision of the Pension Commissioner is reasonably supported by substantial evidence, then it must be sustained. Board of Firemen's Relief & Retirement Fund Trustees of Houston v. Marks, 150 Tex. 433, 242 S.W.2d 181, 27 A.L.R.2d 965.

■   The evidence is without dispute that appellee developed disabling chronic bronchitis from his long service with the Houston Fire Department fighting fires in the capacity of a pipe and ladder man.

Neither is there clear dispute with the testimony of Dr. Jackson that for appellee to remain in Houston would be deleterious to his health. Dr. Tucker who did not testify as a witness and hence was not subject to cross examination did state in his report that he saw "no reason why he (appellee) could not be retained in some other position not requiring association with smoke."

The only other position offered appellee was in the index division which required him to travel on the streets of Houston where he would be subjected to gasoline fumes and other impurities found in the atmosphere of large cities such as Houston.

It is our opinion that the ex parte statement of Dr. Jackson is not substantial evidence reasonably supporting the decision of the Commissioner that appellee was not totally disabled from performing the work of a fireman. The work of a fireman with the City of Houston necessarily required that appellee live in Houston. The evidence is substantial and without substantial dispute that if appellee continues to reside in Houston his physical condition will worsen.

It is true that appellee indicated a willingness to remain in Houston and continue

work in the Fire Department if he could have obtained the job of maintenance man. This would have been a voluntary act on the part of appellee had he been offered and accepted such work. It is one thing for a man to voluntarily accept hazardous employment and an entirely different matter for a man to be required to continue working in an environment hazardous to his health.

Mrs. Fontenot testified that her husband's respiratory illness, chronic bronchitis and emphysema had steadily grown worse and she detailed their symptoms. She testified that she and her husband were planning to leave Houston, but that "you can't just pull up roots overnight."

It is our opinion that there is no substantial evidence reasonably supporting the decision of the Pension Commissioner.

Appellee fought fires in the City of Houston for about thirteen years and as a result of breathing smoke and fumes encountered at these fires he became physically incapacitated in that he has developed chronic bronchitis and emphysema totally disabling him from engaging in fire fighting work. His physical condition is such that it would be dangerous to his health for him to remain in Houston. We do not believe that he should be compelled to assume this risk.

■   Appellant's remaining point is that the trial court erred in admitting in evidence appellee's requested admission of relevant facts. The objection to the admission of this document was that it was addressed to appellants and their attorneys of record "Mr. Crawford C. Martin and Malcolm L. Quick, Capitol Station, Austin, Texas," whereas these gentlemen were not the attorneys of record, such attorney of record then being Mr. Homer Bouldin.

Rule 169, Texas Rules of Civil Procedure provides that when a party is represented by an attorney of record, delivery of a request for admissions shall be made

to his attorney unless delivery to a party is ordered by the court.

Mr. Bouldin, who, with Malcolm L. Quick, Assistant Attorney General, represented appellants in the trial and appeal of this case, made this statement in objecting to the admission of this document:

"MR. BOULDIN: Your Honor, if we may, we would like to object to them for the same reason that Counsel has given. The way they submit them, the way they are addressed does not comply with the Rule at all. Nowhere were they submitted to the attorney for the City of Houston, to myself as trial supervisor for the City or to any member of our department. We did receive a copy of them but we are not required to answer on that basis. We say definitely that they are not admissible and they are not required to be answered by either of the Defendants herein.

THE COURT: Gentlemen, I am not sure I understand. They are addressed to the Firemen's Relief and Retirement Fund Trustees of Houston, and you received a copy of them?

MR. BOULDIN: Yes, sir, they were not addressed to us as attorney as the Rule provides. The point we make here, Your Honor, is that the Attorney General, Mr. Quick, are attorneys for the Pension Commissioner and the record so reflects in this case. We are attorneys for the Board. They were not addressed to us as attorneys for the Board but to the Attorney General and Mr. Quick.

THE COURT: I take is that there is no denial that they were received by your office?

MR. BOULDIN: No, sir, we are saying that the original was not sent to us and was not addressed to us for any reason. I would like for the record to show that only a copy was sent to the City Attorney's office and my desk.

THE COURT: Yes, sir."

 Rule 169 does not require that a request for admissions be addressed to any one. It requires delivery to the attorney of record if there is one unless the Court directs delivery to a party. Delivery of the request was made to the attorney of record. This is all the rule requires. The requested admissions were properly received in evidence and were properly deemed admitted as they were not answered as required by the rule.

The judgment of the trial court is affirmed.

Affirmed.